**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Arthur Wilson WHITE, Jr., Defendant-
Appellant.**

**No. 26629.**

United States Court of Appeals
Fifth Circuit.

Dec. 3, 1969.

Robert G. Petree, Bornstein & Petree, Orlando, Fla., Samuel S. Jacobson, Datz & Jacobson, Jacksonville, Fla., for defendant-appellant.

Edward F. Boardman, U. S. Atty., Middle District of Florida, Gary B. Tullis, Allan P. Clark, Asst. U. S. Attys., Jacksonville, Fla., for plaintiff-appellee.

Before TUTTLE and SIMPSON, Circuit Judges, and CASSIBRY, District Judge.

CASSIBRY, District Judge:

Arthur Wilson White, Jr., appeals his conviction by jury for failure to submit to induction into the Armed Forces. 50 App. U.S.C. § 462. Without reaching

any other issue we reverse on the ground that there was no basis in fact for the Selective Service Appeal Board's ruling that White was not entitled to a conscientious objector classification.

White registered with the Selective Service System on November 29, 1960 and was classified I-A on February 16, 1961. From that time until July 1966 he held a succession of student and occupational deferments. He attended Emory University from September 15, 1960 to March 1963. He attended Stetson University from September 1963 to June 1964. He reentered Stetson in September 1965 and graduated with a B.A. Degree on May 29, 1966. Since graduation he has been an Assistant Planner for the Orange-Seminole-Osceolo Planning Commission in Orlando, Florida. On July 27, 1966 for the first time he filed a special selective service form with his local Selective Service Board, applying for a conscientious objector classification. 50 App. U.S.C. § 456(j). On October 11 White's local Board continued him in I-A classification, stating that the Board's opinion was that the defendant's convictions were of a personal moral code. On October 21 defendant filed an appeal with the Board from their I-A classification and on the same day the Board forwarded the case to the Selective Service Appeal Board, Middle District of Florida.

On November 2, 1966 the Appeal Board determined that the defendant should not be classified as a conscientious objector. On the same day White's Selective Service file was transmitted by the Appeal Board to the United States Attorney for the Middle Federal Judicial District of Florida for an advisory recommendation from the Department of Justice regarding White's conscientious objector claim. A hearing was held before a special hearing officer and an F.B.I. investigation was conducted. The hearing officer thereafter issued a report to the Conscientious Objector Section of the Justice Department. That section in turn recommended to the Appeal Board that appellant be classified I-A.[1] On August 2, 1967 the Appeal Board classified White I-A. On September 19, 1967 White was ordered to report for induction on October 10, 1967. At the induction station White refused to take the symbolic step forward. Indictment, trial and conviction followed.

In denying defendant's motion for judgment of acquittal made at the end of trial in which he urged, inter alia, that there was no basis in fact for the Appeal Board's denial to him of conscientious objector status, the district court found that White did have a conscientious objection to war that was long standing, but that his objection to war was not by reason of religious training and belief but stemmed from his own political, sociological, or philosophical views or personal moral code that existed before his affiliation with his church.[2] In a word the trial court found that White's conscientious objection to war was insufficiently religious. The Government's position is that the record contains sufficient evidence of White's insincerity to support the Appeal Board's denial of the conscientious objector classification. We think the

---

1. The record contains a résumé of the inquiry which was apparently submitted to the Justice Department along with the hearing officer's report. From the résumé and hearing officer's report the Chief of the Conscientious Objector Section of the United States Department of Justice made a report and recommendation to the Appeal Board of the Middle District of Florida. He simply paraphrased portions of the résumé, added legal citations and recommended that White's claim to Class I-O be denied.

2. The Trial Court said:
   " * * * he does have a conscientious objection to war that is of long standing and it doesn't seem to be an issue on that fact and all of these good people who came in and testified at the various hearings, Mr. Gray and the other Ministers, there is nothing to contradict the fact that he was conscientiously opposed to war and presumably still is, but in the law there is a difference between just being conscientiously opposed to war by reason of religious training and belief."

trial court and the Appeal Board both erred. There was no basis in fact for finding that White's conscientious objection was not based on religion or that he was not sincere in his beliefs.

■ An Appeal Board considers matters of classification *de novo* and its classification of a registrant is one of first instance, superseding that of the local Board even though the classification is the same as the one given by the local Board. Clay v. United States, 397 F.2d 901 (5th Cir.1968).

■ The scope of review in cases of this nature has been stated to be the narrowest known to law. Blalock v. United States, 247 F.2d 615 (4th Cir. 1957). We may grant relief only if there is evidence of a lack of procedural fairness or if the conclusion of the Appeal Board is without any basis in fact. Estep v. United States, 327 U.S. 114, 66 S.Ct. 423, 90 L.Ed. 567 (1946). In *Estep* the Court said:

"* * * The provision making the decisions of the local boards 'final' means to us that Congress chose not to give administrative action under this Act the customary scope of judicial review which obtains under other statutes. It means that the courts are not to weigh the evidence to determine whether the classification made by the local boards was justified. The decisions of the local boards made in conformity with the regulations are final even though they may be erroneous. The question of jurisdiction of the local board is reached only if there is *no basis in fact* for the classification which it gave the registrant." (Emphasis added). 327 U.S. at 122, 66 S. Ct. at 427.

We have held that this language in the *Estep* case means that the decision of the Board must be sustained if there is *any basis in fact* for the classification. Greer v. United States, 378 F.2d 931 (5th Cir.1967). See also Foster v. United States, 384 F.2d 372 (5th Cir. 1967).

White's case arises under the Selective Service Act of 1948 as amended, which provided in pertinent part:

"Nothing contained in this title * * * shall be construed to require any person to be subject to combatant training and service * * * who, by reason of religious training and belief, is conscientiously opposed to participation in war in any form. Religious training and belief in this connection means an individual's belief in relation to a Supreme Being involving duties superior to those arising from any human relation but does not include essentially political, sociological, or philosophical views on a merely personal code.[3]

■ The United States Supreme Court's definition of "religious training and belief" is set forth in United States v. Seegar, 380 U.S. 163, 166, 85 S.Ct. 850, 854, 13 L.Ed.2d 733 (1965):

"* * * the test of belief 'in a relation to a Supreme Being' is whether a given belief that is sincere and meaningful occupies a place in the life of its possessor parallel to that filled by the orthodox belief in God of one who clearly qualifies for the exemption. Where such beliefs have parallel positions in the lives of their respective holders we cannot say that one is 'in relation to a Supreme Being' and the other is not."

It posed the question thusly:

"* * * does the claimed belief occupy the same place in the life of the objector as an orthodox belief in God holds in the life of one clearly qualified for exemption?" 380 U.S. at 184, 85 S.Ct. at 863.

Before a conscientious objector classification may be denied on the ground that the applicant's beliefs are based upon "political, sociological or philosophical views or on a merely personal moral code", those factors must be the sole basis of his claim for the classification. Fleming v. United States, 344 F.2d 912

---

3. 62 Stat. 612 (1948) as amended, 50 App.U.S.C., Section 456(j) (1958).

(10th Cir.1965). In other words, "The use by Congress of the words 'merely personal' seems to us to restrict the exception to a moral code which is not only personal but which is the sole basis for the registrant's belief and is in no way related to a Supreme Being." United States v. Seegar, *supra*, 380 U.S. at 186, 85 S.Ct. at 864.

In White's explanation of his beliefs, he attributed his convictions wholly to religion. In answer to the specific question on his conscientious objector application which asked him to define the nature of his objection to war, he explained his objection was based entirely on religion. Throughout his Department of Justice hearing, he emphasized that is objection was religiously based.[4]

White offered 12 witnesses at the hearing officer's inquiry, five of whom testified that they had known him during the critical years and then stated without exception that White was a very religious person during the time they had known him. White says that the other seven were prepared to likewise testify if they had been permitted to do so. All five who did testify stated categorically that his conscientious objection was religiously motivated and was of long standing.

As a further part of its investigation, the Justice Department talked with a number of other people who had been acquainted with White during his lifetime, and the results of these interviews were contained in the résumé which has already been referred to. Many of them also attested to White's longtime religious inclinations and felt they were genuinely motivated. We have examined the record of the officer's hearing and the text of the résumé and have discovered no probative evidence reflecting adversely upon White's sincerity and honesty. Almost without exception those who knew him best felt that he was a religious person and that he was and has been sincere in his conscientious objection to war. For the hearing officer and the Chief of the Conscientious Objection Section of the Justice Department to reach a contrary opinion, they would have had to disbelieve all the witnesses in the case or base their opinion upon suspicion and speculation.

■■ *Seegar* holds that the " * * claim of the registrant that his belief is an essential part of a religious faith must be given great weight", 380 U.S. at 184,

4. In paragraph 3 of White's reply to "Résumé of Background Information", he set forth the basis for his objection to war which explanation was set forth in much greater detail on his questionnaire and in the officer's hearing:

"That the registrant's first recollection of a firm and settled attitude of objection to personal participation in acts of warfare would have been during his high school years as a result of a combination of factors emanating from his intense study of history plus his personal involvement in religious activities. That from that time to the present, the registrant's personal feelings, convictions and religious beliefs have become increasingly more intense in that he has never wavered in his conviction and his deep and abiding personal belief that it is morally wrong and religiously impossible for registrant to personally participate in any act in furtherance of warfare. That the registrant's present and particular feeling of conscientious objection emanates

most directly from his dedicated belief in the expressions of Jesus Christ as recorded in the New Testament and the teachings of the early Christian church to the time of Constantine. Registrant attaches significance to the admonitions of Jesus Christ to Peter in the Garden of Gethsemane that he should not draw the sword, which admonition the registrant interprets as a prohibition against the acts of warfare. The registrant cites this illustration in that Peter was in the process of drawing his sword to protect Jesus Christ from attack and arrest and if ever in the life of man there could have been a justification for defensive violence, this surely must have been the occasion; yet the Lord Jesus Christ admonished and spoke against such violence. This incident from the religious history of the registrant's faith is merely cited for illustrative purposes and is not by any means the sole and exclusive basis for his conscientious objections.

85 S.Ct. at 863, and suggests that doubts as to the religious sufficiency of a belief must be resolved in favor of the registrant. *Id.* Once a claimant satisfies his burden of making out a prima facie case for an exemption, affirmative proof is required to refute his claim, and mere disbelief is not sufficient. Dickinson v. United States, 346 U.S. 389, 74 S.Ct. 152, 98 L.Ed. 132 (1953); Matyastik v. United States, 392 F.2d 657 (5th Cir. 1968); United States v. Washington, 392 F.2d 37 (6th Cir. 1968). In *Dickinson,* the court said:

" * * * when the uncontroverted evidence supporting a registrant's claim places him prima facie within the statutory exemption, dismissal of the claim solely on the basis of suspicion and speculation is both contrary to the spirit of the Act and foreign to our concepts of justice." 346 U.S. at 397, 74 S.Ct. at 158.

In support of its contention that White was insincere, the Government points out that in White's initial registration questionnaire reviewed by his Local Board on January 20, 1961, he did not claim to be a conscientious objector. From this time until October 11, 1966 White was given the benefit of a number of scholastic and occupational deferments and, during this period, three informational questionnaires were mailed to him; yet on none of them did he indicate or mention a claim for conscientious objection or any other change of status. But this was adequately explained by White in his original conscientious objector questionnaire when he stated that at 18 years of age he "did not feel sufficiently well-grounded in [his] beliefs, but generally because [he] feared the disapproval of [his] parents and the pain such action would cause them."[5] He made the same explanation to the trial court:

"I knew that my family would be very severely upset if I did make this classification request and as it turned out when I did make it they were severely upset. I knew also that the difficulties involved with conscientious objector cases were great. I knew this from hearsay, and in all honesty I desired to postpone this necessity as long as I could."

This type explanation could be contrived but it is unlikely considering his highly religious and pacifistic record during the years preceding his application for conscientious objector status.

The Government claims White demonstrated insincerity because he was "known to have used alcohol excessively and on two occasions was arrested for drunken and disorderly conduct." During one of these episodes there was evidence that he had broken into a home. There is no evidence in the record that White used alcohol excessively except on these two occasions. To the contrary, the evidence is that he drank infrequently and in moderation. In his testimony concerning these two episodes, White explained that during his freshman year at college he and another fraternity pledge became very drunk and were arrested by the police. White explained that he became upset over a friend being depledged from his fraternity and deliberately set out to get drunk, and while under the influence he had broken a window to get into a home to keep warm. He was arrested and the University required that he undergo a routine psychiatric examination which was perfunctory and of no consequence. Nothing more came of the incident. Later in his college career, he was one of eight students arrested for disorderly conduct, which consisted of singing the Bach Magnificat (a religious work of Johann Sebastian Bach) in Atlanta's Piedmont

---

5. The résumé of the inquiry contains this information:

"Another neighbor in Orlando, Florida, advised that she has been acquainted with the registrant and his family approximately 20 years. She was aware that the registrant had made a claim to be a conscientious objector and that this matter was brought to her attention by his mother. She said his family is quite upset about this."

Park close enough to a nearby apartment house to cause one of the tenants to complain to the police. It is plain in the record that these were isolated college incidents not in any way reflective of White's general character and conduct.

White's sincerity is further questioned because "while attending Emory University White's church activities were virtually nonexistent." His church activities were limited but not his interest in religion which began at an early age. He was reared in a Presbyterian home. He attended religious services in Park Lake Presbyterian Church in Orlando, Florida, regularly throughout his junior and high school years and was chaplain of the Sunday School class during his high school years. During his pre-college and early college period, his religious interest deepened; he made exhaustive inquiry beyond Christianity into Oriental religion, primarily Hinduism. While admitting that he temporarily laid aside some of his former beliefs about Jesus during his precollege and early college days, and decided to leave the Presbyterian Church, he retained a strong belief in the Judo-Christian concept of God and derived his conscientious objection to war from what he regarded as the law of God. He did not admit to being nonreligious during that period. On the contrary, even though he came to doubt that Jesus was the begotten Son of God, "He did not cease to believe in God and in the unconditional love and obedience owed to him." Neither did he reject "the whole teachings of Jesus." His study of Oriental religions "only reenforced [his] devotion to God and to an ethic of selflessness."

When White was 20 years old he returned to Christianity and was confirmed in the Episcopal Church and even attempted to enter the Episcopal priesthood. During the four years prior to filing his conscientious objector application in 1966, he regularly attended church, and served as president of the choir at St. Luke's Cathedral. He conducted the services of evening prayer

service on Sunday night. During that four-year period he was indisputably a devout Episcopalian and a confirmed believer in an institutionalized religion.

 The Government points to White's disbelief in Christ at a point in his life as a factor which could have been a basis in fact for denying him conscientious objector classification. This contention is without merit since *Seegar* does not require belief in a traditional God, let alone the particular God of a particular religion.

All the evidence indicates that White's objection to war was rooted in genuine religious belief. Moreover, although not necessary, the evidence even indicates that White did believe in the traditional God. Since there is no affirmative evidence to refute the proferred religious nature of his objection, he was entitled to conscientious objector classification. The Appeal Board's conclusion to the contrary was without any basis in fact.

The conviction and sentence are set aside.