Rex Douglas CHAMP, Petitioner,

v.

Honorable Robert C. SEAMANS, Jr., Secretary of the Air Force, et al., Respondents.

Civ. A. No. 3162–N.

United States District Court, M. D. Alabama, N. D.

Sept. 3, 1971.

Champ Lyons, Jr., Capell, Howard, Knabe & Cobbs, Montgomery, Ala., for plaintiff.

Ira DeMent, U. S. Atty., Montgomery, Ala., for defendants.

## FINDINGS AND CONCLUSIONS

VARNER, District Judge.

This cause is now submitted upon the merits of the petition for habeas corpus filed herein on August 27, 1970, by Rex Douglas Champ. Upon this submission, the Court makes the following findings and conclusions:

That this Court has jurisdiction of this matter is not controverted. 28 U. S.C. § 2241. This Court further has jurisdiction of the parties. 28 U.S.C. § 81.

The evidence reflects that the Petitioner, Rex Douglas Champ, is a member of the United States Air Force, presently assigned to the 3800th Base Wing, Maxwell Air Force Base, Montgomery, Alabama, in the Middle District of Alabama, Northern Division. The Respondent, Colonel Charles G. Weber, is Wing Commander of the 3800th Wing, Maxwell Air Force Base, and as such has military jurisdiction of the Petitioner. Respondent, Robert C. Seamans, Jr., as Secretary of the Air Force, also has such jurisdiction of the Petitioner.

The Petitioner contends that he is now unlawfully in the custody of the said Respondents as a result of adverse administrative actions on his claimed status as a conscientious objector. He contends that these actions were unlawful in that the military failed to duly process and determine his applications for discharge under Air Force Regulation 35–24 and Department of Defense Directive 1300.6. Petitioner contends that there is no basis in fact for the adverse administrative decision of the military authorities.

The Court finds that there has been proper application for remedies in this case and that the Petitioner has duly exhausted his administrative remedies. Pitcher v. Laird, 421 F.2d 1272 (5th Cir.) ; Hall v. Burdett, Civil Action No. 1154–S, DCMDAla., July 27, 1971.

Preliminarily, it is appropriate to observe that claims of conscientious objection, whether lodged before or after induction, are governed by the same standards of review. Rothfuss v. Resor, 443 F.2d 554, (5th Cir., June 15, 1971).

The scope of review of a denial of conscientious objection status is very limited and said to be the narrowest know to law. Robertson v. United States, 417 F.2d 440 (5th Cir.) ; Rothfuss v. Resor, supra. However, military authorities are not vested with total discretion in such matters, and a determination of insincerity must be based upon hard, provable, reliable facts which substantially refute the petitioner's profes-

sions of sincerity. Helwick v. Laird, 438 F.2d 959, 963 (5th Cir.); United States v. Stetter, 445 F.2d 472 (5th Cir. 1971).

■ If the Petitioner has presented a prima facie case of conscientious objection the remaining question is whether there is any basis in fact for the military's action in denying conscientious objector status to the Petitioner.

■ As to the first question before the Court, whether the Petitioner has presented a prima facie case for conscientious objector status, there is substantial evidence in all of Airman Champ's applications for discharge that he is, by reason of religious and moral beliefs conscientiously opposed to war in any form. United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733; Welsh v. United States, 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308.

Exemplitive of the Petitioner's beliefs are the following quotations from his application of April 9, 1970. Asked to describe the nature of the belief that is the basis for his claim, Champ replied, in part:

"I cannot serve in the military because such service conflicts with my religious beliefs. I can do harm to no man; nor can I knowingly contribute aid which may propagate violence, distruction, aggression, and result in mental or physical domination of another human being. I must show kindness and love toward all people, and attempt to create an atmosphere of love, peace, and happiness which must become man's lot here on earth.

"Life is a sacred commodity which I do not have the right to destroy.

"'For if ye forgive men their trespasses your heavenly Father will also forgive you. * * *' (Matthew 6:14, 15)

"'Thou shalt not kill.'" (Ex. 20:13)

Asked to explain how, when and from whom or from what source he received the training and acquired the belief that is the basis of his claim Champ wrote:

"I became a conscientious objector in June of 1969 after a great deal of 'soul searching'. Until that time I had never encountered any conflict between my religious beliefs and my environment, but, as I became more familiar with my obligations in the military, I also became more familiar with my religious faith. I found that the two were incompatible.

"Probably the most significant source of my religious guidance has been the wisdom of Christ in the *New Testament*. The effects of military service upon my conscience have caused me, in the last year and a half, to examine the *New Testament* more clearly in order to reach an understanding of my mission in life. I have been totally unable to find military service compatible with Christ's teachings and especially his in *The Sermon on the Mount*. (Matthew 5–7)."

Asked under what circumstances he believes in the use of force, Champ replied:

"Do violence to no man. (Luke 3:14)

"I cannot participate in action that may cause harm to my brethren, nor can I condone the use of force which results in violence and aggression toward another man.

"If I, or someone close to me, was under personal attack, I would attempt to use a combination of reason, understanding and love to dissuade the attacker. Rational persuasion is much more effective than violence. Only as a last resort would I ever use any form of physical force to repel the attacker; and then only to the extent of defending from attack. I could not kill the man, nor could I intentionally cause him serious injury, because my religious training has stressed the sanctity of life and the importance of nonviolent action to preserve life."

Applying the *Seeger* test, this Court is of the opinion that the Petitioner estab-

lished a prima facie case. During the course of the military's review of Champ's case a number of those he contacted agreed and suggested discharge. Numerous judicial decisions are also in agreement that similar beliefs to those professed by Champ constitute a prima facie case. E. g. United States v. Stetter, supra; United States v. Joyce, 437 F.2d 740 (7th Cir.); United States v. Lemmens, 430 F.2d 619 (7th Cir.); United States v. Deere, 428 F.2d 1119 (2nd Cir.); Kessler v. United States, 406 F.2d 151 (5th Cir.).

■ Having found that Airman Champ has met the burden of showing a prima facie case for conscientious objection, the next question is whether the record reveals basis in fact which overcome the Petitioner's prima facie entitlement to conscientious objector status. Once the Petitioner has established a prima facie case, the burden shifts to the military to refute such entitlement by affirmative evidence. There must be something factual evident from the record which substantially blurs the contentions of the Petitioner and which casts doubt upon his sincerity. Kessler v. United States, 406 F.2d 151 (5th Cir.); Batterton v. United States, 260 F.2d 233 (8th Cir.). However, mere suspicion or surmise is not sufficient. United States v. Stetter, supra; Helwick v. Laird, supra; United States v. White, 421 F.2d 487 (5th Cir.); Dickinson v. United States, 346 U.S. 389, 74 S.Ct. 152, 98 L.Ed.2d 132.

The government in this proceeding alleges six bases in fact to support its conclusion that Airman Champ is not sincere in his request for conscientious objector status. The Petitioner asserts that there is no basis in fact for the Air Force's refusal to release the Petitioner and further alleges he was denied due process in the treatment of his application.

■■ I. The government's first alleged basis in fact is that the Petitioner is insincere in that he made misrepresentations as to the amount and source of certain reading materials contended to have influenced his evolution as a conscientious objector; and that the Petitioner is insincere in merely copying materials into his application without having read the original sources.

In his interview with Captain Stewart the Petitioner stated that since arriving at Maxwell he had checked out and read books from the Air University Library on a weekly basis but could only specifically remember the names of four authors and no titles of the books. Captain Stewart subsequently checked the files of the Air University Library and could find no record of Champ having checked out any of the books referred to in the interview. The government contends that while one claiming to be a conscientious objector need not be an avid reader to justify his claim, when he does use readings to substantiate his claim, inconsistencies or untruthfulness as to this reading matter are facts which substantially blur the applicant's picture of sincerity.

The Petitioner points out that during the course of a rapid examination he was being asked to specifically recall titles of books, many of which he had read a year in the past. He further alleges that his readings could not be substantiated in the Air University Library because they were borrowed from the Maxwell Community Library, another library on base which he confused with the Air University Library. He also contends that the Petitioner has a substantial personal library containing many of the books referred to in his applications; that Champ's roommate described him as an avid reader (before the Stewart interview); and that Champ telephoned Captain Stewart in an attempt to explain the inconsistencies and was denied an opportunity to do so.

The inconsistencies as to Champ's readings are, in this Court's view, suspicious circumstances and cannot be elevated to hard, provable facts sufficient

to deny an otherwise sincere application. The fact that the Petitioner was not able to remember the titles of books he has read or the particular library from which they came is not a basis in fact.

The contention of the government that Champ was not sincere because he merely copied materials from an Army Field Manual, as reflected in the "Handbook for Conscientious Objectors", rather than reading the manual itself, is likewise insufficient to establish a basis in fact. Testimony showed that this manual was discontinued and Champ's access to it would have been limited. One's sincerity is hardly diminished by his using the best words he can find to express it.

■ II. The government next contends that its determination of insincerity is based upon the fact of inconsistencies as to Airman Champ's version of his contact with his preacher, Reverend Peterson. It alleges that while Champ stated he had at one time been very active in the church and attended weekly, Reverend Peterson told Captain Stewart that Champ was not a very active member of the church. The government stresses these inconsistencies as a blurring of Champ's picture of the facts on the basis that Champ cited Reverend Peterson as the one living person who had the greatest influence on his beliefs.

The Petitioner argues that the inconsistencies as to activity in the church are explained by the time factors involved, that while Captain Stewart was thinking in terms of recent contact, the Petitioner was answering as to the past. Captain Stewart asked Champ, "How often did you see Reverend Peterson before you came in the service?", and Champ answered, "Weekly for a long time."

The evidence shows that, while Champ did have considerable contact with the church during his younger years and was in fact an acolyte, this contact had terminated a good while before he entered the service. Under the evidence it is clear that Reverend Peterson's statements that Champ was not an active member of the church and Champ's statement that he was, may not be inconsistent depending on the time factor involved. Since Captain Stewart did not specify any time other than the time before Champ entered the service, this Court cannot say that these possible inconsistencies can be considered a basis in fact rather than merely a misunderstanding or suspicious circumstance.

■ III. The government's third alleged basis in fact for its determination is that while Champ's first two applications were based solely upon religious grounds, his third application tracked the *Welsh* decision allowing nonreligious beliefs.

We see little merit in this ground for a determination of insincerity. As a general matter, it cannot be said that, if an applicant for conscientious objection status claims both religious and moral or ethical reasons, he must choose one as his basis for claiming such status. Specifically, however, the evidence was that Champ's third application was prompted by the military's requiring additional documentation of his application and that much of the *Welsh* material was suggested to Champ by an Air Force legal officer who helped Champ prepare his later application. In light of these facts, it certainly cannot be said that these considerations would establish a basis in fact for the military's conclusion.

■ IV. The government's fourth ground of attack concerns the timing of Champ's first application. Airman Champ voluntarily enlisted in the Air Force in August of 1968, he testified that his pacifism began to evolve around December of 1968, yet he did not apply for conscientious objector status until June of 1969, at which time he was studying the North Vietnamese language.

The government concedes that under recent decisions, namely, Rothfuss v. Re-

sor, supra, and Hall v. Burdett, supra, the timing of an application without support by other basis in fact is not in itself sufficient basis for rejecting a prima facie case for conscientious objection. However, it contends that the inconsistencies pointed out by its other alleged bases in fact are sufficient corroboration for the timing of Champ's application to become, in itself, a basis in fact.

The Petitioner contends that timing, even if supported, would not be a basis in fact under the circumstances of this case. There was no evidence that Champ applied when he did out of fear of transfer to a combat zone—in fact, all of Champ's classmates, as rumor had told them, were stationed in Okinawa rather than Viet Nam. Further, the evidence was that Champ did not claim to have been a conscientious objector before June of 1969 because his beliefs had not fully crystallized until that time.

It cannot be required that a conscientious objector become so inclined at a specific point in time—indeed, it might well be a suspicious circumstance if the realization did come to him "overnight". Such beliefs, if in fact they are sincerely held, are often evolved through a long process months before his actual applica-many aspects, and the fact that an applicant may have begun this evolutionary process of thoughtful consideration of tion cannot be considered sufficient to refuse the application. See United States ex rel. Brooks v. Clifford, 409 F. 2d 700 (4th Cir.).

■ V. The government next contends that Champ is not opposed to "all wars" as required for conscientious objector status but merely to the Viet Nam conflict.

The only evidence supporting this allegation of basis in fact is contained in Captain Stewart's report. Captain Stewart bases his conclusions as to this point on several factors: That Reverend Peterson stated that Champ "was con-

cerned, of course" about the war in Viet Nam; that Champ said he joined the Air Force so he could stay close to schools in the United States and he did not talk to the Army recruiter for very long; that Champ stated that he did not like the Viet Nam War; and finally, that Champ's application coincided with his study of the Vietnamese language.

As to Reverend Peterson's comments relative to whether Champ ever spoke out against "the war" as such, he stated that his impression was "it was just the killing", not the war as such. The facts that Champ may have wanted duty in the United States and did not seriously consider enlisting in the Army do not constitute a basis in fact to disprove Champ's testimony that he is against all killing in any war. Indeed, this Court finds no basis in fact to refute that Champ has never made any other indication but that it is all violence and killing to which he objects, not just that in Viet Nam.

■ VI. The government's final alleged basis in fact concerns Champ's testimony that no specific person or fact was responsible for his change in feelings toward the military, but that the change was prompted by the cumulation of "negative training" which crystallized the military's purpose as destruction and violence.

This argument is similar to that alleged to the timing of the Petitioner's application, that the change must be dramatic in order to be sincere. This, as the Court has indicated before, simply cannot be required.

The government further places some weight on Champ's statement that before he entered the service he was not aware of the purpose of the military. If Champ did contend it was purely his training which created his conscientious objection, the Court would be inclined to agree that such naivete would be surprising if not suspicious, but the evidence shows that Champ's contention is

that his training only intensified his feelings and caused him to begin further considerations of his true religious and moral beliefs. Under the evidence, this circumstance alone cannot be considered a hard, cold fact sufficient to refute a prima facie case of conscientious objection.

The Court is of the opinion that the government's alleged bases in fact are insufficient each of themselves or taken as a whole to constitute a basis in fact to defeat the Petitioner's prima facie case.

It was contended at times that Captain Stewart's report was based upon a hurried and strict "cross-examination" of the Petitioner, which created much of the confusion and apparent inconsistencies on which the government based its case. While it may be true that Captain Stewart's interview was in the nature of cross-examination, this was his proper purpose. Captain Stewart performed his job admirably, he found legitimate suspicious circumstances relating to Champ's application, and he pursued them to what he felt was a proper determination. The Court by its rather lengthy examination of the bases reported by Captain Stewart in no way means to criticize the Captain but, to the contrary, commends him on a job well done.

### ORDER

In accordance with the Findings and Conclusions entered herein this date, it is the

Order, judgment and decree of this Court that Petitioner's application for the writ of habeas corpus be, and the same is hereby, granted. It is further

Ordered that the Respondents, their agents and any others acting for and in their behalf, release and discharge the Petitioner from the custody and control of the United States Air Force.