Charles G. HAMILTON, Petitioner,

v.

Major General Edward M. FLANAGAN, Jr., Commanding Officer, Ft. Riley, Kansas, Respondent.

No. L–1795.

United States District Court, D. Kansas.

Feb. 29, 1972.

**6**

## MEMORANDUM AND ORDER

THEIS, District Judge.

Pursuant to 28 U.S.C. §§ 2241, Charles G. Hamilton filed a petition for a writ of habeas corpus seeking his release from custody of the United States Army. At the time his petition was filed he was stationed at Ft. Riley, Kansas, serving as a Private E–2 in Medical Company, MEDDAC, in a noncombatant status. Petitioner has since (on December 13, 1971) been released from active duty and is assigned to the United States Army Control Group (Annual Training) RCPAC, St. Louis, Missouri, an Army Reserve assignment. He has a six year Army Reserve obligation beginning December 14, 1971, remaining to be served. He thus is still subject to Army custody, and this case has not been mooted by his release from active duty.

Petitioner was inducted into the Army on April 14, 1970, for a two year active duty period. He was classified 1–A–O[1] by his local board. He has been so classified during all of his active duty tour. On April 14, 1970, he made formal written application, pursuant to applicable Army Regulation 635–20 (dated 31 January 1970) for reclassification of 1–O.[2] Such a classification would have entitled Hamilton to immediate and final discharge from the Army. His application was processed through military channels in the usual manner, ultimately reaching Department of Army level where it was considered by the Class 1–O Conscientious Objector Review Board. By this point in time, AR 630–25 had, pursuant to the holding in Welsh v. United States, 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970) been amended. The amended·Army Regulation was dated 31 July, 1970, effective 15 August, 1970. The

---

1. One conscientiously opposed to combatant training and service in the Armed Forces. AR 135–25.

2. One conscientiously opposed to participation in war in any form and conscientiously opposed to participation in both combatant and noncombatant training and service in the Armed Forces. AR 135–25

Board (see Page 1 of opinion) applied the provisions of the amended regulation. The Board by its written opinion, dated 25 January, 1971, made two findings, as follows:

1. Applicant lacks the depth of conviction required to qualify for discharge as a conscientious objector. (Paragraph 2, Page 1, of Board's opinion.)

2. Although applicant states his views have changed (since entry on active duty) so that he may no longer participate in war in any form he has not in fact described any such change in his application. (Paragraph 2, Page 3, of Board's opinion.)

Based upon the above findings, the Board disapproved his request and refused to change his classification from 1–A–O to 1–O. Hamilton then filed his habeas corpus petition in this court.

The Court considered the petition and issued its Order to Show Cause directed to the Respondent, who has filed his Answer and Return. Attached to the Answer and Return is, among other things, a copy of Hamilton's application and the opinion of the Board denying the requested classification.

A few days before Respondent's Answer and Return was filed, Petitioner filed an unsigned "Request for Production of Documents" requesting, it appears, production of substantially all records, papers, documents, instruments and transcripts made in connection with his application for classification as a conscientious objector.

Subsequent to the filing of Respondent's Answer and Return, Petitioner filed his "Counterclaim to Answer and Return", in which he denies all allegations in the Answer and Return except Paragraph 5 thereof, which he admits. By virtue of admitting Paragraph 5 of the Answer and Return and by the allegations in Paragraph 4 of his Counterclaim, Hamilton and Respondent agree that this Court is limited in this case in its review of the Board's actions to a consideration of whether or not there exists any "basis in fact" for the Board's denial of the requested 1–O classification.

■ The law appears to be well settled on this point. See Negre v. Larsen, 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971); Witmer v. United States, 348 U.S. 375, 75 S.Ct. 392, 99 L.Ed. 428 (1955); Pittman v. United States, 411 F.2d 625 (10th Cir. 1969); United States v. Maine, 417 F.2d 951 (10th Cir. 1969), and Owens v. United States, 396 F.2d 540 (10th Cir. 1968). Indeed, the courts may not weigh the evidence to determine whether the classification made by the Board was justified and the classification can be overturned only if it has "no basis in fact" in the record. Estep v. United States, 327 U.S. 114, 66 S.Ct. 423, 90 L.Ed. 567, 573 (1946) and Witmer v. United States, supra. In such cases the scope of review is ". . . the narrowest known to the law." Blalock v. United States, 247 F.2d 615, 619 (4th Cir. 1957) and Bishop v. United States, 412 F.2d 1064, 1969 (9th Cir. 1969).

■ Although, in considering the determination made by local draft boards, the courts will not apply a test of "substantial evidence", the courts may properly insist, as a necessary condition to denial of the classification requested, that there be some evidence in the record that is incompatible with the registrant's evidence of exemption. In other words, if ". . . the *uncontroverted* evidence supporting a registrant's claim places him prima facie within the statutory exemption, dismissal of the claim solely on the basis of suspicion and speculation is both contrary to the spirit of the act and foreign to our concepts of justice." (italics added) Dickerson v. United States, 346 U.S. 389, 74 S.Ct. 152, 98 L.Ed. 132 (1953).

■ The standards for measuring claims of in-service objectors are the same as those applicable in a pre-induction situation. Gillette v. United States, 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d

168, 176 (1971) and Champ v. Seamans, 330 F.Supp. 1127 (D.C.M.D., Ala., 1971).

The test for determining whether a conscientious objector's beliefs were religious or not was stated in United States v. Seeger,[3] in these words:

"A sincere and meaningful belief which occupies in the life of its possessor a place parallel to that filled by the God of those admittedly qualifying for the exemption comes within the statutory definition."

In Welsh v. United States, supra, the United States Supreme Court held that the proper test in determining whether a registrant's conscientious objection to all war was "religious" under the statute[4] was whether his opposition to war stemmed from deeply held moral, ethical, or religious beliefs which ". . . would give the no rest or peace if they allowed themselves to become a part of an instrument of war," and reiterated the requirement that such beliefs must be held with the strength of traditional religious convictions.

The principal ground upon which the Board denied Hamilton's application was ". . . applicant lacks the depth of conviction required to qualify for discharge as a conscientious objector." All members of Hamilton's chain of command and the interviewing chaplain[5] found Hamilton to be sincere in his stated beliefs and the Board so found, stating, "We do not question the sincerity of the applicant in his professed beliefs, but we question whether his professed beliefs, 'occupy the place in life of its possessor paralleled to that filed by the orthodox belief in God of one who clearly qualifies for the exemption.' (United States v. Seeger.)"

It is difficult, in considering this language, to determine precisely what the Board means. The Board appears to be saying that while, on the one hand, they find Hamilton to be sincere in his beliefs, they find, on the other hand, that his beliefs are not "sincere enough" to reach the level of conviction required. The Board is, apparently, confusing the quality or nature of the belief with the amount or quantity applicant possesses. The Board stated twice, in its opinion, that it did not question his sincerity. The record is not only devoid of any indication of insincerity, the scales are weighted wholly the other way.[6] Considering all the language used by the Board in making these two findings, this court concludes that it must have meant, not that Hamilton lacks the depth of conviction required, but rather that his professed beliefs are not of a quality or nature sufficient to ". . . occupy a place in the life of its possessor parallel to that filled by the God of those admittedly qualifying for the exemption." When the Board finds that Hamilton is "sincere", it necessarily finds, in this Court's opinion, that his

3. 380 U.S. 163, 176, 85 S.Ct. 850, 859, 13 L.Ed.2d 733, 743 (1965).

4. 50 U.S.C.App. § 456(j).
AR 635–20 (dated July 31, 1970) reflects the holding in the Welsh case. The wording of the previous regulation (dated January 21, 1970) was as follows:
"This regulation sets forth the policy, criteria, and procedures for disposition of military personnel who, by reason of religious training and belief, claim conscientious objection to participation in war in any form."
The wording of the amended regulation of July, 1970, is:
"This regulation sets forth the policy, criteria and procedures for disposition of military personnel who, by reason of

deeply held moral, ethical, or religious beliefs, claim conscientious objection to participation in war in any form."

5. See letters, a part of Respondent's Exhibit B, dated November 5, 1970, and December 23, 1970.

6. Hamilton's Commanding Officer stated in his letter, dated 6 November 1970, recommending approval:
"I believe that PFC Hamilton is firmly committed to the belief that he cannot conscientiously serve in the military forces. PFC Hamilton's conduct and efficiency while with this unit have been far above that of the average soldier and are a reflection of the sincerity of his efforts and ideas."

objection to war is a "conscientious" one and that he has sufficient "depth of conviction" to meet the requirement that "the applicant's beliefs must be held with the strength of traditional religious convictions." The Court finds that Hamilton's beliefs are so held.

■ Hamilton does not base his conscientious objection on "religious" belief, i. e., religious in the conventional sense. He states so in his application.[7] Nothing appears in the record to the contrary.

■ To qualify for the exemption therefore, petitioner's beliefs may be either "moral" or "ethical" and they must not be based on essentially political, sociological, or philosophical views or a merely personal moral code[8] or considerations solely of policy, pragmatism or expediency.[9]

In Welsh (398 U.S. at 343, 90 S.Ct. at 1798, 26 L.Ed.2d at 320) it was pointed out that:

"In applying § 6(j)'s exclusion of those whose views are 'essentially political, sociological, or philosophical' or of those who have a 'merely personal moral code,' it should be remembered that these exclusions are definitional and do not therefore restrict the category of persons who are conscientious objectors by 'religious training and belief.' Once the Selective Service System has taken the first step and determined under the standards set out here and in Seeger that the registrant is a 'religious' conscientious objector, it follows that his views cannot be 'essentially political, sociologi-

cal, or philosophical.' Nor can they be a 'merely personal moral code.' See United States v. Seeger, 380 U.S., at 186, 85 S.Ct. at 864, 13 L.Ed.2d at 748."

No reason appears why the same logic should not apply to AR 635–20 with the same force it applies to Section 6(j) of the statute.

The first questions then, to be resolved by this Court in this case boil down to:

Are Petitioner's beliefs moral or ethical in nature?

If so, is there a "basis in fact" in the record to support the Board's finding that Petitioner's moral or ethical beliefs do not occupy in his life a place parallel to that filled by the God of those admittedly qualifying for the exemption?

If Petitioner's beliefs are moral or ethical in nature and the answer to the second issue, above, is an affirmative one, then the holding of the Board must be sustained and relief denied Hamilton. If Hamilton's beliefs are not moral or ethical in nature, or if the answer to the second issue, above is a negative one, then a third question pertaining to whether or not the record shows that Petitioner's views have changed since induction must be considered and answered.

It is true that there is much in Hamilton's application which is not relevant or pertinent to the above issues. There is much therein with which a sincere believer in the conventional "God" of a "conventional" religious denomination

---

7. In Paragraph 2 k Hamilton states:
    "I applied for conscientious objector classification from Selective Service System Local Board 39, Marinette County, Marinette, Wisconsin, in 1969. I applied for neither a 1–A–O or a 1–O classification because the form stated that application was based on religious beliefs. I expressly told my local draft board that my application for classification as a conscientious objector was *not* based on religious belief and, therefore, I could not request classification as a conscientious objector on that basis. I

told the board I simply chose not to kill and would not serve in a military organization except in a noncombatant position, particularly the position of a Medical Corpsman. I told the board I would not serve in the military except as a Medic. I was subsequently classified 1–A–O by my local board."

8. This is the language of 50 U.S.C. App. § 456(j).

9. This is the language of AR 635–20 taken from the Welsh case. (398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308, 320).

would probably take issue. If all or a substantial portion of such expression was quoted here to show the nature of Hamilton's belief and the place it occupies in his life, and all the rest he states went unmentioned, few, in the Court's opinion, would disagree with the Board's decision.

The Court is aware that *all* of what Hamilton states should be considered, in the first instance, but that which is *not relevant* or *pertinent* to the above issues should be disregarded. It is surplusage —not material to the issue to be decided. Belief in a conventional "God" is not necessary to meet the statutory standard or the regulatory requirement. That was put to rest in the Seeger case, supra,[10] previously discussed in this opinion.

The Army Regulation specifies what will be contained in the objector's formal application. Among other things, Part (2) (a) requires "A description of the nature of belief which is the basis of claim."

Hamilton's reply to this request provides the answer to the nature of his belief. Close examination of the entire record will reveal whether there is a "basis in fact" for the Board's holding.

In response to Part (2) (a) Hamilton states, among other things, the following:

"I was baptised a Roman Catholic by my parents who are baptised, practicing Roman Catholics . . . I, however, no longer consider myself a practicing Roman Catholic. I no longer consider myself a member of a religious body, sect, or organization. I no longer hold a theology—except, perhaps agnosticism—if that can be termed a 'theology'—I do not know whether God, or *a* God, or *a god* or a Supreme Being or a Supreme Power (or however people want to term that which is commonly termed 'God') exists.
I 'believe' that it makes no difference, except in a 'psychological way,' whether I 'believe' in 'God', or 'don't believe' in 'God.'

I do not want to serve the military because I believe that the highest value human beings can hold is life—and I do not want to 'take life'—and as a final resort, the military 'takes life' to accomplish what it sets out to do. And I do not want to serve an organization which has, as its final method of accomplishment, the taking of life —the military is the primeval, survival-of-the-fittest aspect of man—the military is the extreme organization of egoism . . .

And surely many objectors, myself included, especially in this period of human progress, do not object only to killing and do not object only to war, but object to all forms of injustice and human meanness—we carry on the spirit of objectors such as Baldwin and Fraina, who dedicated their lives not only to opposition to warmaking, but also to the betterment of the condition, the situation of men, materially and spiritually, physically and mentally.

I and many other objectors not only want to see the day where there is no war, we also want to see the day when there is no misery in the world at all —no hunger, no thirst. We want to see the day when all men are free to do what they want to do, be what they want to be.

And we realize that war causes so much misery among men and that misery among men is a prime cause of war. We see war and human misery, human deprivation, so related to one another that we desire the end of both —the end of war *and* human deprivation, social wrongs.

So the struggle against war, is for us, a struggle also against unjust and imperfect society. . . .

What Fraina articulated when he argued that a man can have a conscience without holding a religious creed, is the cry, 'Cannot a man, sim-

10. See 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733, 742 and 743.

ply as a human being, not want to harm others. Cannot a man, simply as a human being, object to war, to the organized, planned killing of other human beings.'

This is my position—I want to make my decision simply as a human being. I think that human beings do not have to rely on some other strength than their own, to be 'good.' In fact, I believe that human beings must be responsible for their actions and not attribute them to some other force particularly some transcendental force. I believe that reliance upon some sort of transcendental force is a means human beings used to excuse the errors they make, the harm they do.

I think that, if human beings are to live happily, if human beings are to progress to the point where all share the good things of life, men must realize that they are responsible for improving the conditions of their life. Man is responsible for man—he is his brother's keeper. . . . "

There is more in the application in the same vein. Most of what is quoted above (except the paragraph in which Hamilton states he does not want to serve in the military) is not mentioned by the Board in its opinion. The Board seems to have either overlooked or disregarded the above quoted portions of the application. Such things as where Hamilton was sitting when he wrote a portion of his application and the fact that Pvt. Hamilton missed the "Woodstock National" and that he stated in his application that "I cannot truly say that I cannot serve in the military . . ." along with other irrelevant portions of his application are quoted by the board in its opinion to no purpose. The issue is whether or not Petitioner's beliefs are of a nature and quality sufficient to en-

title him to the requested classification. The relevant and pertinent inquiry is what Hamilton believes, and the nature and quality of such beliefs. That Hamilton's beliefs are ethical and moral in nature is too obvious for serious argument.

The court has searched the records in vain for evidence or proof that is incompatible with the registrant's evidence of exemption. In short, this court can find no such evidence. It can find no "basis in fact" in the record to support the Board's finding. The material and relevant evidence in the record is simply uncontroverted and places Hamilton prima facie within the statutory exemption. Dismissal of his claim solely on the basis of those portions of his application which are not relevant and not material leaves the Board, in the opinion of the Court, in the position of having denied the requested classification on the basis of suspicion and speculation which is, to quote Mr. Justice Clark in Dickinson v. United States, supra, " . . . both contrary to the spirit of the Act and foreign to our concepts of justice."

The Court finds there is no "basis in fact" in the record to support the Board's finding that Petitioner's moral or ethical beliefs do not occupy in his life a place parallel to that filled by the God of those admittedly qualifying for the exemption.

This brings us to the remaining issue of whether or not the record shows that Petitioner's views have changed since induction into active service.

The Board's opinion states: (Page 3)

"The entire application is supposed to describe a change in the professed beliefs of the applicant from the beliefs he held prior to his entry in the Army. If there is no change, this regulation [11] is not applicable. If

---

11. AR 635-20 provides:
"3. POLICY. a. Consideration will be given to requests for separation based on bona fide conscientious objection to participation in war, in any form, when such objection develops subsequent to entry into the military service.
b. . . . Requests for discharge after entering military service will not be favorably considered when—

there is a change then it must be tested by the standards set forth in AR 635–20. The Board finds that although PVT Hamilton says his views have changed so that he may no longer participate in war in any form he has not in fact described any such change in his application."

Again, the Board apparently overlooked, or chose to disregard, the relevant and material statements in the application. Hamilton states:

"I, at one time (particularly, last summer when I applied for conscientious objector status from my local draft board, thought I could serve in a military organization as a Medic—because I thought I would—first and foremost—be helping relieve the suffering of human beings, rather than primarily aiding the military organization.

But after I was inducted into military service I discovered that I was first and foremost aiding the military—and *then* helping to relieve the suffering of human beings.

I realized it clearly during the first day of basic training.

I had had two weeks in the army before basic training began—during which I was assigned, and fulfilled various tasks—kitchen police details and various 'policing' and 'beautification' details. And during those two weeks, I saw that I—in performing those tasks—was aiding the military rather than individual human beings. But it became clearly apparent to me during the first day orientation for basic training. During orientation, several speakers—a chaplain (captain), a lieutenant colonel, a colonel—told us—a group of 'C.O.'s'—that we, 'C.O.'s' were better soldiers than most military personnel—that we caused less problems and were more conscientious (no pun intended) in performing our 'duty' than most soldiers.

\* \* \* \* \* \*

And the drill instructors told us that is [sic] didn't matter for what reason, reasons, we were, are conscientious objectors. The drill instructors said the only thing that mattered was that we satisfactorily complete the basic training program. They said it didn't matter that we were conscientious objectors.

And in even more subtle ways than the above admission, I began to perceive that truly it did not matter to the military whether we were conscientious objectors or not—as long as we performed satisfactorily what the military demanded of us.

As long as we did what the military demanded, we could and would be utilized to the best advantage of the military by the military—

our stands, our statements, in opposition to killing and war were of no consequence—

we were, are, as much in the military as anyone else, as much an integral, necessary part of the military—

And when I completed basic training, I was assigned to the other side of the military installation for training as a medical corpsman.

And one of the first things I learned was that the motto of the medical corps is 'To conserve the fighting strength'—

NOT 'To help my fellow man,' NOT to help relieve suffering,' but 'To conserve the fighting strength'—a further indication that I was, am, indeed serving the military primarily.

\* \* \* \* \* \*

And I know now that, as a medical corpsman, I would first and foremost be aiding the military and then, secondarily, helping people.

(1) Based on conscientious objection which existed, but which was not claimed prior to notice of induction, enlistment or appointment."

And this I do not want to do."

And, as with the first issues considered, the holding in Dickinson v. United States, supra, is controlling. The evidence in the record describing the change that took place in his beliefs after entry on active duty is simply uncontroverted and places Hamilton prima facie within that class of persons entitled to be considered for 1-O classification. The Court finds there is no "basis in fact" in the record for the Board's second finding.

In his Answer and Return, Respondent suggests the Court may be without jurisdiction because of lack of exhaustion of military remedies, citing, among others, Polsky v. Wetherill [12] and Noyd v. McNamara.[13] The holding in the *Polsky* case was based on the *Noyd* decision. The judgment in *Polsky* has been vacated pursuant to the Memorandum prepared and filed with the Supreme Court by the Solicitor General. Since it is admitted by Respondent that Hamilton is not under charges or awaiting trial by Courts-martial and there is no indication that further military review of the Board's action by the Army Board for Correction of Military Records is pending, the position defined in the Solicitor General's Memorandum in the *Polsky* case disposes of the "jurisdiction" issue.

The conclusion reached in this case makes unnecessary any decision with respect to Hamilton's request for production of documents.

Petitioner's application for a writ of habeas corpus is granted, and

It is ordered that Petitioner be classified 1-O and Respondent, or his successor in interest as military custodian of Petitioner, release Petitioner from all military custody and control forthwith.

---

12. 438 F.2d 132 (10th Cir. 1969).

13. 378 F.2d 538 (10th Cir. 1967) cert. denied, 389 U.S. 1022, 88 S.Ct. 593, 19 L. Ed.2d 667.