411 F.2d 622
 DOW CORNING CORPORATION, Plaintiff,
v.
CAPITOL AVIATION, INC., Defendant and Third-Party Plaintiff-Appellee,
v.
NORTH AMERICAN ROCKWELL CORPORATION and its Aero Commander Division, formerly known as Rockwell Standard Corporation and Aero-Commander, Inc., Third-Party Defendants-Appellants.
 No. 17127.
 United States Court of Appeals Seventh Circuit.
 May 20, 1969.
 
 John J. Crown, Albert E. Jenner, Jr., William B. Davenport, Chicago, Ill., for appellants, Raymond Mayer, Jenner & Block, Chicago, Ill., of counsel.
 James B. O'Shaughnessy, Chicago, Ill., Aaron J. Kramer, for defendant and third-party plaintiff-appellee, Schiff, Hardin, Waite, Dorschel & Britton, Chicago, Ill., of counsel.
 Before DUFFY and HASTINGS, Senior Circuit Judges, and SWYGERT, Circuit Judge.
 DUFFY, Senior Circuit Judge.
 
 
 1
 This is an appeal from an interlocutory order dated April 4, 1967, striking one of appellant's affirmative defenses, and from a final judgment dated June 21, 1967 entered after a trial on the merits.
 
 
 2
 Initially, plaintiff (Dow) claimed breach of a written contract for the purchase by plaintiff and the sale by defendant (Capitol) as distributor for Rockwell Standard and Aero-Commander, Inc. (Aero) of a certain Aero-Commander aircraft, with shipping date in August 1965.
 
 
 3
 Aero was dismissed as a party defendant as there was no privity of contract shown between Dow and Aero. However, Capitol filed a cross claim against Aero claiming 1) If Capitol were found liable to Dow, Aero was legally obligated to indemnify Capitol; and 2) Aero's conduct resulted in loss of profits to Capitol for which loss Aero was legally obligated to reimburse Capitol. Dow is not a party to this appeal.
 
 
 4
 The District Court entered judgment for Dow against Capitol for $64,000. After a hearing on the cross claim, the District Court ruled Aero should reimburse Capitol for the $64,000, and further found Capitol should recover an additional sum of $43,865 for lost profits, making a total judgment for Capitol against Aero of $107,865.
 
 
 5
 Aero is a producer of executive type aircraft many of which it sells to private industry. Aero actually manufactures only the air frame. It purchases from others the engines, brakes, landing gear, avionics (electronic radio and radar equipment), and other items. Officers and representatives of Capitol and Dow were aware of this practice.
 
 
 6
 In the fall of 1964, at an aircraft industry convention in Miami which was attended by personnel from Dow and Capitol, Aero announced it would offer for sale a twin engine turbine powered executive type passenger aircraft which it hoped to have available in about a year. Aero announced it would employ its proven pressured Grand Commander air frame and convert it from a piston powered to a turbine powered aircraft. The plane was to be called "Turbo-Commander, 680T."
 
 
 7
 On November 17, 1964, Capitol placed its written order with Aero for one of these new type aircraft at wholesale price of $260,000 with standard equipment. In an appropriate blank on the order with reference to a delivery date, was a typewritten insertion TBD (to be determined). Also typed on the order was the recital "Specifications to be supplied at a later date." On February 19, 1965, Aero accepted Capitol's order.
 
 
 8
 On February 10, 1965, Capitol ordered from Aero two more Turbo-Commanders and a conventional piston type aircraft. As to delivery dates, these three orders also contained the letters TBD (to be determined). These three orders were accepted on February 18 and 19, 1965.
 
 
 9
 On February 25, 1965, Capitol's sales manager, at Dow's request and without prior consultation with Aero, wrote to Dow's Administrative Service Manager, Coultrip, advising that Aero's "target delivery date" for Turbo-Commander 1552-12[1] was "the end of August, 1965," and enclosed several alternative purchase orders. No delivery date was set. Dow took the information from one of the orders and placed it upon its own order form and submitted it to Capitol. However, Dow, without consultation with Aero, and although a delivery date had not been fixed between Aero and Capitol, inserted August 1965 as the date of shipment. Capitol executed the order committing itself to the August 1965 date. Later, Aero was informed by Capitol that it had sold a plane to Dow but no details were given.
 
 
 10
 Aero had arranged to purchase the engines for the new aircraft from Garrett AiResearch. When Garrett began supplying production line engines as opposed to the hand-built prototype power plants, Aero experienced difficulties of which Capitol and Dow were each informed. Meetings were held at Aero's plant in June, August, September and October 1965. In the first week of November, after Aero's manager had experienced a "hair-raising" trip in the new plane, Aero announced on November 18, 1965, that delivery of these aircraft would be delayed indefinitely. It was not until June 1966 that Aero began delivery of the new aircraft for consumer use. Aero delivered two in June, six in July and a total of thirty by the end of 1966.
 
 
 11
 In connection with plaintiff Dow's purchase of the aircraft, it deposited with defendant Capitol the sum of Five Thousand ($5,000) Dollars in January 1965, and Twenty Thousand ($20,000) Dollars on March 12, 1965. These payments were to be applied against the purchase price of the aircraft.
 
 
 12
 On January 5, 1966, plaintiff Dow terminated the agreement with Capitol due to defendant's failure to deliver the aircraft. Defendant thereupon returned plaintiff's deposits totaling Twenty-five Thousand ($25,000) Dollars.
 
 
 13
 On January 6, 1966, plaintiff Dow entered into an agreement with Aerodynamics, Inc. for the purchase of a Beechcraft King Air Model A-90 with turbine engines, agreeing to pay therefor $439,910 not including sales tax.
 
 
 14
 During the period between August 1965 and January 6, 1966, plaintiff Dow leased an airplane from defendant Capitol at a rental expense of Fourteen Thousand ($14,000) Dollars. Other expenses were incurred by plaintiff in anticipation of the delivery of aircraft 680T.
 
 
 15
 Apparently it was the theory of the trial court that although Aero, in all its written agreements and communications with Capitol, had insisted that the delivery date of the new aircraft be open, nevertheless Aero agreed to a modification by reason of conversations had with officials or employees of Aero. In our view, these casual statements were not sufficient to establish a modification of the written contract or to show an agreement between the parties for delivery of the aircraft on a definite date.
 
 
 16
 Consistent with industry custom and practice, there were valid reasons for the contract to provide for an open delivery date. All parties concerned knew that the aircraft which Aero proposed to construct was in an experimental stage of development; that on November 17, 1964, the date of Capitol's order, a prototype of that aircraft had not been flown; and further, that the plane had not been type certified, and no air-worthiness certification had been issued for a turbo-commander type aircraft. Both certificates were necessary prerequisites to the delivery of aircraft to a distributor for re-delivery to a customer.
 
 
 17
 Furthermore, it was well known by all concerned in the transaction before us, that Aero was dependent on other suppliers for engines, brakes, landing gear and avionics.
 
 
 18
 Certain it is that Capitol, at no time, indicated any objection to the open delivery date. In executing the order for the plane, Capitol did use Aero's wholesale purchase order form. However, it was Capitol, not Aero, which filled out that form. It was Capitol and not Aero which entered the letters "TBD" (to be determined) in the specified delivery date block. The order as written up by Capitol was accepted by Aero.
 
 
 19
 On June 18, 1965, and on June 30, 1965, Capitol ordered supplements. In both of these supplements, it was Capitol and not Aero which inserted "TBD" in specifying delivery date. In November 1965, Capitol supplemented once more and again it was Capitol and not Aero which filled in the information and transmitted the form to Aero, but this time the space for delivery date was left blank.
 
 
 20
 When Capitol ordered the aircraft on November 17, 1964, it did use Aero's purchase order form. However, it was Capitol and not Aero that filled out that form. It was Capitol and not Aero which entered the letters "TBD" which meant "to be determined" in the specified delivery date block. Certainly, at that time, Capitol showed no objection to leaving the delivery date flexible, to be determined at some future time.
 
 
 21
 On September 1, 1965, Capitol once more supplemented its November 1964 purchase order by cancelling two small items and again it was Capitol, not Aero, which filled in the information, but this time Capitol left blank the delivery date block.
 
 
 22
 The controversy in this case arose because Capitol voluntarily, and without knowledge thereof by Aero, assumed a greater contractual obligation to Dow.
 
 
 23
 There is no breach of promise here because Aero undertook the obligation of delivery of a plane then in experimental stages, at such time as it could be flown safely. Aero could not furnish and would not be permitted by the Federal Aviation Agency to deliver a plane that would not fly safely.
 
 
 24
 Our conclusion in this respect is, in itself, a reason for a reversal but in the alternative, it is our view that the trial court erred in holding that Paragraph 4 of the purchase order signed by Capitol was not an exclusive remedy and that it was unconscionable and an unreasonable attempt to limit liability under the Uniform Commercial Code, Chapter 26, Illinois Revised Statutes of 1967.
 
 
 25
 The trial court pointed out that Sec. 2-719(1) (b) of the Code provides that a remedy as provided is optional unless it is "expressly agreed to be exclusive." It is true that nowhere does the clause use the word exclusive, but the clear import is that there shall be no remedy other than the return of the deposit. The clause speaks in terms of liability rather than remedies, but it is clear that the parties expressly agreed that this was to be the only recourse. To hold otherwise would be to introduce a new requirement that certain words be used to express the intent of the parties lest they later be found not to have limited their remedies.
 
 
 26
 As an affirmative defense of the cross claim of Capitol, Aero relied on Paragraph 4 of the purchase order signed by Capitol, to-wit:
 
 
 27
 "Aero Commander, Inc. shall not be liable for failure or delay in making delivery for any cause whatsoever. If delivery of the products covered by this order is not made within thirty (30) days of the `Specified Delivery Date', or of the `Revised Specified Delivery Date', Purchaser may cancel this order and have the full deposit refunded, provided that such nondelivery is not caused by act of God, war, riot, strikes or unavoidable casualty."
 
 
 28
 The defense based on the foregoing paragraph was stricken by the trial court in an interlocutory order dated April 4, 1967. The Court held that paragraph 4 of the Wholesale Purchase Agreement between Capitol and Aero was "unconscionable" and constituted "* * * an unreasonable attempt to limit liability, and that such attempts are condemned by § 2-719" of the Uniform Code.
 
 
 29
 Section 2-719 of the Code demonstrates that there are permissible limitations as to remedies. Section 2-719(1) (a) provides that damages may be limited "as by limiting the buyer's remedies to return of the goods and repayment of the price * * *." It is obvious that this remedy deprives the buyer of the benefit of his bargain, as does Paragraph 4 in the instant case, but it is nonetheless deemed permissible.
 
 
 30
 The case before us is not one where a seller wantonly disregards his obligations to the buyer and sells to another simply for his financial advantage. Here, Aero was desperately trying to construct a new type of aircraft that would be safe to fly. Furthermore, it had been careful not to commit itself to any penalty for late delivery. Under the circumstances of this case, such a provision was reasonable.
 
 
 31
 The trial court alternatively relied upon Section 2-718 combined with Section 2-302. Section 2-718 provides that an unreasonably large liquidated damage is void as a penalty, and the Comment speculates that an unreasonably small amount might be stricken under the section on unconscionable contracts or clauses. Although it is something of a misnomer to call the return of a deposit a liquidated damage, we will assume the section is available to the appellee.
 
 
 32
 Section 2-302 makes clear that the unconscionability of a clause is to be judged not in the abstract, but rather in its commercial setting. Here, Aero was constructing what was at least for itself a new type of airplane construction. The plane was to be turbine powered rather than piston powered. Capitol was aware of this. Aero began by making a prototype. This was successful but later effort with production engines proved hazardous. There was an account of a hair-raising trip which revealed substantial difficulty. Aero points out that it is common to the industry to not promise delivery dates, and to obtain a release from liability in the event of failure to deliver. In fact, Aero pointed out that when Dow bought another plane from Aero's competitor, it accepted the same terms as it now claims are unconscionable.
 
 
 33
 We hold that under the circumstances of this case, Paragraph 4 was not unreasonable or unconscionable. It would have been better practice for the District Court to have held a hearing pursuant to Section 2-302 of the Code. However, the printed and the written evidence before us is sufficient for us to determine if the trial court erred in holding Paragraph 4 of the agreement to be unreasonable and unconscionable. We hold that the trial court erred in this respect.
 
 
 34
 Aero argued that a series of negotiations between it and Capitol which terminated their relations after the difficulty involved in this litigation, constituted an accord and satisfaction of any liability it may have incurred. In view of our decision, it is unnecessary to consider the point.
 
 
 35
 We hold that Aero, at no time, promised to deliver an aircraft to Capitol on a specified date. We further hold that in any event, Aero successfully limited its liability by including Paragraph 4. Therefore, we reverse the judgment Capitol has obtained against Aero.
 
 
 36
 Reversed.
 
 
 
 Notes:
 
 
 [1]
 1552 was the plane's serial number and 12 indicates the production position,i. e., this was to be the 12th aircraft produced.