NITRIN, INC., Plaintiff-Appellee, *v.* BETHLEHEM STEEL CORPORATION, Defendant-Appellant.

First District (5th Division) No. 60987

Opinion filed January 23, 1976.

Hackbert, Rooks, Pitts, Fullagar & Poust and Wildman, Harrold, Allen & Dixon, both of Chicago (Max Wildman, Harold W. Huff, and Kay L. Schichtel, of counsel), for appellant.

. Isham, Lincoln and Beale, of Chicago (Charles A. Bane, Richard J. Phelan, Matthew J. Iverson, and Paul F. Hanzlik, of counsel), for appellee.

Mr. JUSTICE DRUCKER delivered the opinion of the court:

This is an action brought by plaintiff against defendant and Foster Wheeler Corporation to recover damages caused by the failure of a large pressure vessel, known as a converter, at its Cordova, Illinois, anhydrous ammonia plant. Foster Wheeler was the general contractor that built the plant. Defendant was the manufacturer of the converter. At the close of plaintiff's evidence a directed verdict was entered in favor of Foster Wheeler.[1] The case against defendant was presented to the jury which returned a verdict in the amount of $4,769,907.50 in favor of plaintiff, and judgment was entered thereon. Defendant appeals, contending that (1) the recovery sought by plaintiff was barred by the terms of the contract for fabrication of the converter, and (2) certain evidentiary rulings by the court hindered it in the presentation of its defense. Defendant does not contend that the judgment was against the manifest weight of the evidence nor does it contest the size of the judgment. Plaintiff has cross-appealed, contending that (1) even if contractual provisions bar its recovery under a breach of contract or implied warranty, the judgment should still be upheld under its negligence theory, and (2) the court improperly struck a strict liability count in its complaint.

In August 1962 plaintiff contracted with Foster Wheeler for the construction of the anhydrous ammonia plant. The contract provided that Foster Wheeler would be responsible for the overall design of the plant and for field construction. It was contemplated that certain component parts of the plant would be manufactured by subcontractors.[2] Thus, in the late spring and summer of 1962, while Foster Wheeler was finalizing its agreement with plaintiff, it entered into negotiations with defendant for construction of the converter. They were initiated on May 29 when Foster Wheeler sent defendant an inquiry, dated May 23, to which was attached a document titled "Specifications for Forged and Welded Pressure Vessels." A provision of that document stated:

"XVIII. *GUARANTEES*

Vessels supplied under this standard are to be guaranteed by their supplier as free from fault in design, workmanship or materials

---

[1] Plaintiff's appeal of this order is the subject of appeal No. 60934, which we have decided and filed today, 35 Ill.App.3d 577, —— N.E.2d ——.

[2] Section 8.3 of the contract between plaintiff and Foster Wheeler provides:

"Owner reserves the right to approve any subcontractor proposed by Contractor to perform any portion of the work which Contractor believes can be more economically performed by a subcontractor than by Contractor's own forces. Contractor shall submit all subcontracts to Owner for such approval. Owner shall notify Contractor in writing within seven days if such contract is unacceptable."

for the specific conditions (exclusive of corrosion). Should any defects in workmanship or material develop within one year from first operation, not to exceed 18 months from date of shipment, defective equipment or materials are to be replaced without charge FOB supplier's shops."

This inquiry also provided:

"The vessel shall be designed for at least most severe conditions of pressure and temperature. Besides the internal pressure, the loading shall include all dead and superimposed loads, localized stresses and stresses through temperature gradients in vessel."

On June 7 Foster Wheeler sent defendant further specifications, labeled Material Requisition No. 3270-099A, which provided, in part, under the heading "Material and Workmanship Guarantees:"

"*Vendor agrees to repair or replace FOB his plant*, at his expense, any defective materials, equipment and/or machinery, provided defects are discovered within 18 months of date of shipment, or 12 months of plant start-up, whichever is earlier, and provided defects are not the result of erosion, corrosion and/or normal wear." (Emphasis added.)

The June 7 mailing also included, under the heading "Performance Guarantee," the following provision:

"In the event that equipment fails to perform as required by the specifications, *vendor agrees to replace or modify his equipment to the extent that design performance can be met.*" (Emphasis added.)

On June 26 defendant made a price quotation for the materials required by Foster Wheeler. One of the terms of the question was that it "is subject to the attached 'Terms and Conditions of Sale.'" The "Terms and Conditions of Sale" was a printed form prepared by defendant. Under the heading "Buyer's Remedies" it provided:

"*Buyer's Remedies—If the material furnished to the Buyer shall fail to conform to the contract between the Buyer and the Seller* (whether in failing to comply with any express or implied warranty or any applicable specifications or to be within the Seller's standard practices, tolerances, and variations or in any way whatsoever), *the Seller shall replace non-conforming material at the original point of delivery and shall furnish instructions for the disposition of such non-conforming material.* Any transportation charges involved in such disposition shall be for the Seller's account.

*The Buyer's exclusive and sole remedy on account or in respect of the furnishing of non-conforming material shall be to secure*

*replacement thereof as aforesaid.* The Seller shall not in any event be liable for the cost of any labor expended on any non-conforming material or for any special, direct, indirect or consequential damages to anyone by reason of the fact that such material shall have been non-conforming." (Emphasis added.)

In early August defendant sent Foster Wheeler several letters concerning price negotiations and technical matters. Each of these letters specified that the "terms and conditions" of the June 26 mailing would apply.

On August 16 defendant's manager of sales sent to Foster Wheeler a letter which read, in part, as follows:

"On August 15, 1962 our Mr. C. J. Sweeney visited your office at Livingston, New Jersey and discussed with Mr. J. H. Hosek, Purchasing Agent of your Process Plants Division the prices to apply on the separator due to change in dimensions and additional items you requested we supply on this order. We wish to confirm this discussion and requote the following prices.

\* \* \*

Based on your telephone conversation with our Mr. C. J. Sweeney on August 16, 1962, at which time you gave him your P.O. 15-3279-N1-152, it is our understanding that we are released to produce the forgings required for these vessels up to the point of welding the shell sections.

\* \* \*

All other Terms and Conditions in our letter of June 26, August 3 and 13, 1962 will apply.

We thank you for placing this order with us and we would appreciate receiving your formal order at an early date."

Foster Wheeler responded with a letter which stated, in part:

"This is to confirm having placed the subject order number verbally with your Mr. C. J. Sweeney for the supply of the high pressure forged steel vessels for the Subject contract. \* \* \* The [vessels] will be furnished in accordance with our inquiry dated May 29, 1962, supplemented June 1, 1962, including all specifications, requisitions and drawings attached thereto. Further to this, the vessels shall be as covered by your quotation to us dated June 26, 1962, amended August 3, 1962 and your letter of August 13, 1962, confirming engineering revisions to our original inquiry and your quote.

\* \* \*

Please accept this letter as your authorization to immediately start

all operations as planned to bring this contract to an early and successful conclusion."

On August 27, 1962, Foster Wheeler sent a purchase order to defendant which contained the following statements:

"The equipment called for in the requisitions mentioned below and in strict accordance with the specifications, drawings, etc. * * * mentioned therein.

General notes requisition 3270-099A is to be considered an integral part of this order.

Our inquiry 15-3270 dated 5/29/62, supplement # 1 dated 6/1/62, our telegrams of 8/7 & 8/8/62 and Mr. J. H. Hoseks letter of 8/16/62 forms a further basis for this order."

Exhibits in the record indicate that while the converter was being fabricated, defendant made several requests for minor price adjustments. These price adjustments were authorized by Foster Wheeler in written change orders.

On February 7, 1963, defendant sent a letter to Foster Wheeler stating that Foster Wheeler's "purchase order and requisition attached were not in accordance with our quotations dated June 26 and August 3, 13 and 16, 1962." The letter further stated that the "Material and Workmanship Guarantee" and "Performance Guarantee" found in Foster Wheeler's June 7, 1962, Material Requisition were unacceptable to defendant. Foster Wheeler made no written response to this portion of the letter.

In August 1963 manufacture of the converter was completed and it was shipped from defendant's shop in Bethlehem, Pennsylvania, to the plant site on the Mississippi River in the northwest portion of this State. Following a shakedown period lasting several months, the plant achieved the production levels guaranteed by Foster Wheeler in its contract with plaintiff. In late summer of 1964 plaintiff formally accepted the plant.

The converter was the unit in the plant in which ammonia gas was produced. Under high pressure, hydrogen and nitrogen gas were introduced into the vessel through an intake bore in its bottom closure. Within the vessel, in the presence of a catalyst, the hydrogen and nitrogen reacted to produce ammonia gas. The ammonia gas exited through an outtake bore to a condenser located nearby.[3]

On October 4, 1964, a crack developed in the converter, and the plant was shut down. Almost immediately representatives of plaintiff, plain-

---

[3] A more detailed description of the operation of the plant can be found at page 579 of our opinion in *Nitrin, Inc. v. Bethlehem Steel Corp.*, 35 Ill.App.3d 577, —— N.E.2d ——.

tiff's insurer, defendant and Foster Wheeler arrived on the scene and inspected the vessel. They then met in conference to discuss means of putting the plant back in operation. Basically two possible solutions were considered. Defendant's representatives proposed returning the 270-ton converter to its shops in Bethlehem, Pennsylvania, for replacement of the bottom closure. They urged that this course provided the only means of allowing scientists to analyze the cause of the failure. Moreover, they argued, removal and replacement of the bottom closure required the use of tools and facilities found only in defendant's shops. The job could not be done in the field. At least 26 weeks, including transportation time, would be required to effectuate repairs in this manner.

The alternative proposal called for repair of the vessel in the field through utilization of an innovative welding technique. Since it was uncertain how successful this technique would be over the long run, it was proposed that a replacement converter be ordered to be available on a standby basis. It was estimated that field repair would take eight to ten weeks.

The minutes of a meeting held on October 9, 1964, at which these proposals were discussed indicate that plaintiff claimed its daily loss while the plant was shut down would be $27,000. Thus it was estimated that defendant's shop repair proposal would "cost" plaintiff $5,700,000 while field repair would cost plaintiff $1,900,000. Plaintiff, after conferring with representatives of its insurer and Foster Wheeler personnel, opted for field repair. Defendant was not represented at the meeting at which the decision was reached.

Plaintiff and Foster Wheeler requested defendant's assistance in repairing the vessel. Defendant declined, citing its lack of experience in field repair work.

By January 16, 1965, repairs were completed, and the plant was placed back in operation. In addition to repairing the crack, an effort was made to elevate the temperature of the bottom portion of the converter to reduce thermal stress. While repairs were being completed, a replacement converter was ordered from the Chicago Bridge and Iron Company. The original vessel failed a second time in October 1966 and was scrapped. The replacement converter was placed in operation in December 1966.

Plaintiff brought suit in contract and tort against defendant and Foster Wheeler to recover losses it incurred due to the failure and replacement of the converter.[4] The first four counts of its third amended complaint

---

[4] A detailed description of the procedural history of this case in the trial court can be found at page 580 of our opinion in Nitrin, Inc. v. Bethlehem Steel Corp., 35 Ill.App.3d 577, —— N.E.2d ——.

were directed against defendant. Count I alleged that the failure of the converter constituted a breach of guarantees contained in Foster Wheeler's contract with defendant for fabrication of the vessel. It was further alleged that plaintiff was a third-party beneficiary of that agreement. Count II alleged that defendant breached the implied warranties of merchantability and fitness for intended use provided by the Uniform Commercial Code. Count III alleged negligence on the part of defendant in the design and construction of the converter. Count IV alleged that defendant was strictly liable in tort for losses caused by the failure of the converter. On motion of defendant, Count IV was stricken. All counts alleged that plaintiff had suffered direct and consequential damages in the amount of $6,663,301.

At trial plaintiff attempted to prove that the vessel failed due to the presence of two stress raisers, namely, rough machinery and sharp corners in the intake bore of its bottom closure. It was plaintiff's theory that these stress raisers were present due to defendant's poor craftsmanship and design work. Plaintiff's evidence showed that the cracks in the converter had formed in the vicinity of the sharp corners and rough machining. Its experts testified that existing stresses in the system were multiplied by these stress raisers to a level which the materials involved could not withstand and that if these stress raisers had not been present, the converter would not have failed. Plaintiff called additional witnesses whose testimony indicated that the failure to machine away the sharp corners and remove the roughness from the interior of the inlet bore was a departure from sound manufacturing techniques.

Defendant denied that the failure of the converter was due to the presence of sharp corners and rough machining. Rather, it attempted to prove that cracks which formed in the vessel were due to the presence of severe thermal stress. Defendant's theory is that thermal stress was produced in the vessel by the great difference between the temperature of gases on entry as opposed to their temperature on exit. Gases entered the vessel at approximately 60°F. and exited at approximately 450°F. The technical data with which Foster Wheeler supplied it did not indicate that the intake temperature would be so low and therefore it did not engineer the vessel to withstand such severe thermal stresses. Defendant's position was that it could not be held responsible for failing to take into account stresses of which it had no knowledge.

Defendant called several members of its engineering and metallurgical staff who testified that they were not aware of the "thermal gradient" present in the vessel. One of them stated that a visual examination of the failed vessel revealed evidence of a "differential temperature condition." Defendant placed great reliance on the testimony of Adolph O.

Schaefer, an independent engineering consultant. It was Schaefer's position that there was no connection between the machining finish and the failure of the converter; that defendant's failure to machine away rough surfaces was not a departure from industry standards; and that the failure was caused by the thermal gradient. On cross-examination Schaefer conceded that if he had manufactured the vessel he would have ordered the elimination of rough machining in the intake bore and further, that a report on the failure prepared by defendant's staff, while reaching no conclusion on causation, found that the failure originated in the vicinity of the sharp corners and rough machining.[5]

Defendant also raised the affirmative defense that the contract for fabrication of the converter provided the purchaser with an "exclusive remedy" for nonconforming goods. Defendant's position was that this exclusive remedy is found in the "Buyer's Remedy" provision of its June 26 mailing; that it limited plaintiff's remedy to repair or replacement by defendant of nonconforming goods; that plaintiff refused to avail itself of this exclusive remedy, electing instead to proceed with a field repair of the vessel; and that by so doing plaintiff waived any right of recovery against defendant.

It was defendant's position that Foster Wheeler's failure to reject all terms of the February 7, 1963, letter further signified an acceptance of the limitation on remedies found in the June 26 price quotation.

Two witnesses called by defendant testified on this matter.

Charles Sweeney, a sales engineer employed by defendant, testified that defendant's correspondence with Foster Wheeler during the summer of 1962 consistently referred to the terms and conditions set forth in its June 26 mailing. Although an "Acknowledgement Copy" of Foster Wheeler's August 27 purchase order bore the legend "Review, approve and sign this copy and return immediately," defendant neither signed nor returned the acknowledgement copy.

Sweeney further testified that defendant never received a reply to its February 7, 1963, letter to Foster Wheeler. However, defendant had, during the course of building the converter, billed Foster Wheeler at prices higher than those previously agreed upon, and these bills had been paid "without question." On cross-examination Sweeney testified that if defendant had not been satisfied with the terms of Foster Wheeler's purchase order, it "could have stopped building the converter at any

---

[5] This report concluded:

"The configuration of the area around the juncture between the radial inlet hole and the vertical uptake hole, plus the local roughness of the machine surface in that area caused a concentration of stress and thus may have contributed to the failure, which appears to have started in this vicinity."

time. \* \* \* We wrote a few letters back and said, 'won't you change some terms of this contract'; but those were never changed. We went ahead and built the vessel like it said here in the contract."

Julius Szigety, an engineer who in 1963 was in charge of the Vessel Group of Foster Wheeler's Process Plants Division, testified he had seen defendant's February 7, 1963, letter calling for amendments to the August 27, 1962, purchase order. However, decisions as to changes in purchase orders were the concern of the purchasing department. In response to defendant's letter, several technical modifications were approved through formal change orders. Szigety testified that these were the only changes made in response to the letter. However, since he was exclusively concerned with engineering problems, he was not aware of actions that might have been taken with regard to the portion of the letter discussing guarantees.

The case was submitted to the jury which returned a verdict in the amount of $4,769,907.50, and judgment was entered thereon.

Defendant, in both a motion for a directed verdict filed at the close of all evidence and in a post-trial motion, asserted that plaintiff was barred from bringing its claim, citing as grounds therefor the issue raised in its affirmative defense. In addition, defendant, in its post-trial motion, asserted that the jury had been improperly instructed and that due to certain rulings on the admissibility of evidence, it had been hindered in the presentation of its defense and therefore deprived of a fair trial.

OPINION

It is defendant's primary contention on appeal that its contract with Foster Wheeler for fabrication of the converter limited plaintiff's remedy in the event of failure to repair or replacement.[6] Defendant argues that plaintiff refused to avail itself of this exclusive remedy and consequently waived any right to recovery.

■■ The focus of our analysis of defendant's contention must be section 2—719 of the Uniform Commercial Code (Ill. Rev. Stat. 1971, ch. 26, par. 2—719) which provides:

"(1) Subject to the provisions of subsections (2) and (3) of this Section and of the preceding section on liquidation and limitation of damages,

(a) the agreement may provide for remedies in addition to or in substitution for those provided in this Article and may

---

[6] Defendant does not contest plaintiff's claim that it was a third-party beneficiary of the contract for fabrication of the converter.

limit or alter the measure of damages recoverable under this Article, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of non-conforming goods or parts; and

(b) resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.

(2) Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Act.

(3) Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not."

Subsection (1)(b) of this provision "creates a presumption that clauses prescribing remedies are cumulative rather than exclusive. If the parties intend the term to describe the sole remedy under the contract, this must be clearly expressed." (Ill. Ann. Stat. ch. 26, § 2—719, UCC Comment 2 (Smith-Hurd 1963).) The courts of this State have held that a party, under a contract providing for a definite and specific remedy in the case of a breach, without expressly making the enumerated remedy exclusive, is entitled to pursue any remedy which the law affords in addition to that provided in the contract. (See *Standard Oil Co. v. Daniel Burkhartsmeier Cooperage Co.*, 333 Ill.App. 338, 77 N.E.2d 526; cf. *Admiral Oasis Hotel Corp. v. Home Gas Industries, Inc.*, 68 Ill.App. 2d 297, 216 N.E.2d 282; *Board of Regents v. Wilson*, 27 Ill.App.3d 26, 326 N.E.2d 216.) Thus, in *Burkhartsmeier Cooperage* a provision in a contract for the sale of steel barrels stating that "these barrels are to be entirely satisfactory in every respect or they will be returned for full credit at no expense to [buyer]" (333 Ill.App. 338, 348) was held not to preclude the buyer from suing the seller for damages resulting from a breach of warranty. Contractual provisions have been found to limit a buyer's remedy only in instances where such intention was clearly expressed in the language and terms of the contract. See *Dow Corning Corp. v. Capitol Aviation, Inc.*, 411 F.2d 622 (7th cir. 1969); *Gates Rubber Co. v. USM Corp.*, 351 F.Supp. 329 (S.D. Ill. 1972); *Adams v. J. I. Case Co.*, 125 Ill.App.2d 388, 261 N.E.2d 1.

In the case at bar defendant recognizes that there exist three possible findings as to the contents of its contract with Foster Wheeler for fabrication of the converter: (1) the contract included defendant's June

26 form; (2) the contract was embodied in the Foster Wheeler purchase order; or (3) the contract consisted of those terms upon which the writings agreed and those provided by law.

The Foster Wheeler purchase order refers to its inquiries of May 29, 1962, and June 1, 1962. The May 29 form states:

> "[S]hould any defects in workmanship or material develop within one year from first operation not to exceed 18 months from date of shipment, defective equipment or materials are to be replaced without charge FOB supplier's shops."

The only form prepared by Foster Wheeler in June 1962 includes a material and workmanship guarantee stating:

> "Vendor agrees to repair or replace FOB his plant, at his expense, any defective materials, equipment and/or machinery, provided defects are discovered within 18 months of date of shipment, or 12 months of plant start-up, whichever is earlier, and provided defects are not the result of erosion, corrosion and/or normal wear."

and a performance guarantee stating:

> "In the event that equipment fails to perform as required by the specifications, vendor agrees to replace or modify his equipment to the extent that design performance can be met."

We do not believe, in light of the *Burkhartsmeier Cooperage* decision, that these forms clearly express an intent by Foster Wheeler to limit the buyer's remedy to repair or replacement and, consequently, we must presume that the clauses prescribe a cumulative rather than an exclusive remedy.

It is equally clear, viewing those documents mentioned in the August 27, 1962, purchase order, that "those terms upon which the writings agreed" did not include an exclusive buyer's remedy. This view is bolstered by an analysis of defendant's February 7, 1963, letter which indicated that, five months after fabrication of the converter had begun, there was still disagreement between Foster Wheeler and defendant as to whether an exclusive remedy provision was included in the contract.

Defendant's June 26, 1962, form does, of course, contain the express statement that "[t]he Buyer's exclusive and sole remedy on account or in respect of the furnishing of non-conforming material shall be to secure replacement thereof as aforesaid." This provision, if it was part of the contract, would support defendant's theory of the case. However, as defendant acknowledges, the jury verdict for plaintiff supports the conclusion that they found that this provision was not so included. Nevertheless, defendant maintains that there exist other grounds upon which we may reverse the judgment.

It is first argued that, as a matter of law, the trial court was required to find that the June 26 exclusive remedy provision was part of the contract.

It is well established that while the construction of written instruments is a question ordinarily left to the court, "where the case turns upon the proper conclusions to be drawn from a series of letters, particularly of a commercial character, taken in connection with other facts and circumstances, it is one which is properly referred to a jury." (*Rankin v. Fidelity Insurance, Trust & Safe Deposit Co.* 189 U.S. 242, 253, 47 L.Ed. 792, 797; *Construction Aggregates Corp. v. Hewitt-Robins, Inc.*, 404 F.2d 505 (7th cir. 1968); 3 Corbin on Contracts § 554, at 226-27 (1960).) Thus, it is the jury's province to determine what terms comprise the contract and the intent of the parties thereto. *Stone v. Appel*, 12 Ill.App. 582; *Mosley v. Hundhausen*, 211 Ill.App. 627; *Trustees of Schools v. Schroeder*, 2 Ill.App.3d 1009, 278 N.E.2d 431.

In the instant case there is a total lack of agreement between the parties as to whether the contract for fabrication of the converter contained an exclusive buyer's remedy. Defendant argued that the contract contains the remedy provision found in its June 26 form. It points to its correspondence with Foster Wheeler in August 1962 in which reference is made to the terms of its June quotation. In addition, defendant relies on its letter of February 7, 1963, apparently in the belief that Foster Wheeler's failure to repudiate it signified acceptance of the remedy terms referred to therein.

Plaintiff, of course, maintained that there was no exclusive remedy provision in the contract. Supporting this position is the fact that the August 27 purchase order made no direct reference to defendant's June 26 form. There is the testimony of Sweeney, defendant's sales engineer, to the effect that if defendant had not been satisfied with the terms of this form, it would have stopped work on the converter. Furthermore, it may be inferred from the testimony of Szigety, a Foster Wheeler engineer with some knowledge of the February 7 letter, that those portions of it referring to remedies were not accepted by his firm. Clearly, there are no writings which indicate that Foster Wheeler accepted all terms of the February 7 letter.

■■ We believe that under these facts and circumstances the issue of what terms comprised the contract was properly referred to the jury.

Defendant has also argued that the jury was improperly instructed.

■■ Initially we note that at the conference on instructions below defendant failed to raise the objections which it argues on appeal and therefore they may not be raised at this time. (*Saunders v. Schultz*, 20

Ill.2d 301, 314, 170 N.E.2d 163.)[7] Nevertheless, we will discuss the merits of defendant's argument.

Defendant points to plaintiff's instruction 18 as being misleading. Plaintiff's instruction 18 provides:

"Plaintiff has filed a complaint containing three counts against the Defendant. In Count I Plaintiff alleged that Foster Wheeler and Defendant contracted to manufacture a vessel in accordance with certain terms and conditions, one of which was the following:

'6. All materials, labor, and equipment which may be furnished to the seller pursuant to this order shall be guaranteed to be of the best quality of their respective kinds unless otherwise authorized by purchaser to be free from faulty design to the extent that such design is not furnished by purchaser, workmanship or material and to be of sufficient size and capacity and of proper material so as to fulfill in all respects such operating conditions, if any, as are specified by purchaser.'

It further alleges that this term was breached when the vessel failed on two occasions and that these failures were a proximate cause of these damages.

The Defendant denies that the foregoing was a term of the contract between it and Foster Wheeler and affirmatively pleads that if any provision was applicable to the failure it was the following provision:

'Buyer's remedies—if the material furnished to the buyer shall fail to conform to the contract between the buyer and seller (whether failing to comply with any express or implied warranty or any applicable specifications or to be within the seller's standard practices, tolerances and variations or in any other way whatsoever), the seller shall replace non-conforming material at the original point of delivery and shall furnish instructions for the disposition of such non-conforming material. Any transportation charges involved in such disposition shall be for the seller's account.

The buyer's exclusive and sole remedy on account of or in respect of the furnishing of non-conforming material shall be to secure replacement thereof as aforesaid. The seller shall not in any event be liable for the cost of any labor expended on any non-conforming material or for any special, direct, indirect or consequential damages to anyone by reason of the fact that such material shall have been non-conforming.'

It further claims that it complied with this term and denies all other allegations contained in Count I.

Turning to Count II, Plaintiff alleges that certain warranties of merchantability and fitness for a particular use where applicable by law to the sale by

---

[7] When plaintiff first presented instruction 18 at the conference on instructions, several modifications were proposed to which it acceded. Plaintiff made these emendations in the instruction and resubmitted it, at which time the following colloquy took place:

"MR. PHELAN [counsel for plaintiff]: At this time, your Honor, Plaintiff resubmits, as amended, Plaintiff's Instruction No. 18, you [sic] Honor, which is the issues instruction, and merely wants to point out to the Court that I inserted arabic 6 following the provision to identify our provision as opposed to the Defendant's. I have indicated that to them. There is an original and a copy.

        ✲    ✲    ✲

THE COURT: Any objection to 18 as revised?
MR. HACKBERT [counsel for defendant]: No, your Honor.
THE COURT: Given."

the Defendant to Foster Wheeler for the ultimate use of the Plaintiff. Plaintiff claims that these warranties were breached and that these breaches were a proximate cause of its damages. The Defendant denies that these warranties are applicable, denies that they were breached and denies that their breach was a proximate cause of the Plaintiff's damages.

Further, Defendant affirmatively pleads that this claim is barred by the 'Buyer's Remedies' above set forth.

Turning to Count III, the Plaintiff claims that it was damaged and the Defendant was negligent in one or more of the following respects: (A) In failing to make proper and necessary stress calculations to compute the stresses that would be generated near the bottom closure of the pressure vessel; (B) in failing to properly design and locate the inlet bore at the bottom closure of the pressure vessel; (C) in failing to properly machine the inlet bore in the bottom closure of the pressure vessel which resulted in portions of the area around the inlet bore being rough machined in a "stepped" condition; (D) in failing to round off all sharp corners in the area of the inlet bore.

The Plaintiff further claims that one or more of the foregoing was a proximate cause of its damages.

The Defendant denies that it was negligent in doing any of the things claimed by the plaintiff and denies that any claimed acts or omissions on the Defendant's part were a proximate cause of the claimed damages. Further, Defendant affirmatively pleads that this claim in Count III is barred by the 'Buyer's Remedies' above set forth."

Defendant contends that, as to the issues raised by Count I of the complaint, this instruction presented the jury with a "false conflict." It is defendant's position that the jurors were, in effect, told to decide which of two provisions were part of the contract: the Quality provision of the purchase order or the buyer's remedy provision of the June 26 quotation. Defendant argues that the subject matter of these provisions is entirely different; that the clause in the purchase order fixes a standard of quality while the clause in the quotation fixes a remedy in the event the quality standards are breached; and that therefore these provisions are in reality complimentary.

Defendant is correct in stating that plaintiff's instruction 18 was not entirely accurate in conveying the precise positions of the parties to the jury. The quality provision of the purchase order and the buyer's remedy clause of defendant's quotation were not antagonistic. However, we note that it has long been the rule that "[i]nstructions, though not perfectly accurate, and subject to criticism, will not be ground of reversal, if it appears on the whole, that the jury was not misled by them." (*Demmer v. American Insurance Co.*, 110 Ill.App. 580, 586; see

also *Chicago Title & Trust Co. v. Goldsmith,* 173 Ill. 326, 50 N.E. 676, 678.) We believe that plaintiff's instruction 18 did succeed in informing the jury as to the crucial issue in the case, that is, whether or not the exclusive remedy clause was part of the contract.

██ Moreover, we note that the jury was given defendant's instruction 28, based on section 2—207 of the Uniform Commercial Code (Ill. Rev. Stat. 1971, ch. 26, par. 2—207) which provides:

"(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless: (a) the offer expressly limits acceptance to the terms of the offer; (b) they materially alter it; or (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this act."

When this instruction is read with plaintiff's instruction 18, there can be no doubt that the jury was correctly informed that they were to decide, on the basis of the correspondence between defendant and Foster Wheeler and their conduct, which terms were part of the contract. Plaintiff's instruction 18 served merely to focus their attention on the terms of the June 26 quotation. We do not believe that defendant has demonstrated that the jury was improperly instructed.

In September 1969 plaintiff closed its plant due to changes in technology which made it economically unfeasible to operate. Plaintiff made a motion in limine to prohibit the introduction of evidence on this topic. Counsel argued that the closing was unrelated to any matter at issue in the case and that bringing the closing to the attention of the jury

"* * * would only invite the jury to speculate, invite the jury to make a decision not grounded on material and relevant evidence." The court granted plaintiff's motion.

Defendant contends that the court committed prejudicial error sufficiently grave to warrant a new trial in granting this motion. Defendant appears to argue that (1) informing the jury of the fact of the "economic death" of the ammonia plant would not inflame its passion against plaintiff and (2) due to the exclusion of such evidence it was precluded from counterbalancing certain "deceptive" comparisons made by plaintiff between the converter built by defendant and the one built by Chicago Bridge and Iron to replace it. This contention is grounded on defendant's assumption that plaintiff relied most heavily on a comparison of the two converters to prove its negligence count. Defendant's analysis of plaintiff's case may be stated as follows: (1) the vessel built by defendant had sharp corners and rough machining in its intake bore. It failed approximately one year after it was put in operation. (2) The vessel built by Chicago Bridge and Iron did not have sharp corners and rough machining in its intake bore. It "never failed." (3) Both vessels were built to the same specifications. (4) The only difference between them was the presence of sharp corners and rough machining in the vessel built by defendant. (5) These features must therefore be seen as the cause of the failure and hence constitute a defect sufficient to establish a case of negligence against defendant.

Defendant maintains that the attempt to compare the converters is akin to the use of evidence of experiments. Citing a standard treatise on evidence, defendant labels this method of establishing proof "the method of difference" technique and argues that it may be employed only with caution since it requires that those things being compared "have every circumstance in common save one." I Wigmore on Evidence § 33, at 422 (1940).

In essence, defendant asserts that (1) the two vessels were not substantially identical in design and structure and (2) the circumstances of their use were not substantially identical and therefore use of this line of evidence was improper. It is the general rule that evidence by comparison is admissible to show defects, unfitness, inferiority, or failure to comply with a warranty of an article, machine or apparatus, where the similarity of the things compared is sufficient to give it probative value, and other circumstances as to place, use and care are not so materially different as to raise troublesome collateral issues. Annot., 66 A.L.R. 81, 92; (1930); see *Skopes Rubber Corp. v. United States Rubber Co.*, 299 F.2d 584 (1st cir. 1962); *Kramer & Son v. Messner & Co.*, 101 Iowa 88, 69 N.W. 1142 (1897); *Louisville Lithographic Co.*

*v. Schedler*, 23 Ky. L. Rep. 465, 63 S.W. 8 (1901); *Brierly v. Davol Mills*, 128 Mass. 291 (1880); *Emerson-Brantingham Implement Co. v. Simpson*, 205 Mo. App. 56, 217 S.W. 599 (1920); *Wilson v. Avery Co.*, 182 S.W. 884 (Tex. Civ. App. 1916).

.. With regard to the design and structure of the vessels, we note that both were built to meet the same specifications provided by Foster Wheeler. Thus both vessels were required to fit the same piping leading from the compressor house and to the condenser; the design of the inlet bore of both vessels was the same; and both vessels were engineered to meet the same production levels. In short, the vessels were substantially similar in all relevant respects save for the two features which allegedly caused the failure—the presence of sharp corners and rough machining in the intake bore of the converter defendant built.

■■ With regard to the use to which the vessels were put, defendant argues that the stresses to which they were subjected would have to be determined. It is plaintiff's position that both vessels, while in production, were subjected to the same pressure and temperature gradient and the fact that the Chicago Bridge and Iron vessel indisputably operated without failure two and one-half times longer than defendant's vessel constitutes a relevant measure of their relative durability. Defendant argues, however, that pertinent to this matter would be information regarding the "cycling" of the vessels, that is, the process of shutting down operations, for any reason, during which extreme changes in temperature and pressure occur. Defendant attempted to introduce evidence regarding the cycling of the Chicago Bridge and Iron vessel. The court refused its admission apparently on the ground that such evidence would necessarily inform the jury of the plant's closing. Clearly this ruling, resulting from the granting of the motion in limine, had some limiting effect on the ability of defendant to present its case. Nevertheless, we believe that there was a sufficient similarity between the converters and the use to which they were put demonstrated during trial that defendant's inability to introduce evidence regarding cycling did not totally rob the comparison of its probative value. Therefore we hold that plaintiff's use of this line of evidence was not improper.

.. Defendant further argues that the court's ruling on the admissibility of evidence of cycling is just one manifestation of the prejudice resulting from the granting of plaintiff's motion. It points to several occasions during the course of trial where counsel for plaintiff stated that the Chicago Bridge and Iron converter "never failed." It is argued that the jurors were thus misled as to the relative durability of that vessel. Defendant's position is that counsel for plaintiff, without fear of contradiction, tricked them into believing that the plant was in operation at

the time of trial when, in fact, it had been shut down four years earlier. ■■ A judgment will not be reversed on account of the rejection of competent evidence if its admission would not have influenced the verdict in behalf of the person alleging error. (*Ryan v. Brant*, 42 Ill. 78; *Ferguson v. Steiner*, 208 Ill.App. 277; *Rubinstein v. Fred A. Coleman Co.*, 22 Ill.App.2d 116, 159 N.E.2d 379.) The converter built by defendant was in operation for approximately 12 months when it failed; the converter built by Chicago Bridge and Iron operated approximately 30 months without failure. Thus, as we have noted above, notwithstanding possible differences in operating conditions, it is uncontroverted that the Chicago Bridge and Iron vessel operated two and one-half times as long without failure as the one built by defendant. Defendant's position appears to be grounded on the proposition that since it was not permitted to introduce evidence of the plant's closing, the jury was misled into believing that the Chicago Bridge and Iron converter enjoyed a period of failure free operation at least six and one-half times as long as that enjoyed by the converter it built. This misconception, defendant would have us believe, led to the jury's verdict in favor of plaintiff. We find no merit in defendant's position. Whether the ratio was one to two and one-half or one to six and one-half, it is obvious that the Chicago Bridge and Iron vessel operated without breakdown for a substantially longer period of time than did defendant's. If the jury was misled at all, it appears clear that the result of such deception would have a de minimis effect on their decision. In addition, we note that while defendant's references to plaintiff's allegedly deceptive statements loom large in its brief, these statements are of far less significance when viewed in the context of the entire record in this case. The trial lasted seven weeks. The jury heard testimony from 24 witnesses, 16 of whom were called by plaintiff. The comparison of the converters to which these statements relate was never more than an incidental part of plaintiff's presentation. Rather, the core of its case rested on expert testimony that (1) the cause of the failure was the presence of sharp corners and rough machining in the intake bore of the converter and (2) the presence of these features resulted from a departure by defendant from sound manufacturing techniques. These points were established independently of any attempt to compare the vessels. Moreover, we note that implicit in the testimony of engineers employed by defendant is the conviction that, if given another opportunity to build the vessel, they would have eliminated the sharp corners and rough machining.[8]

---

[8] Both Gerald S. Hartman, a metallurgical engineer, and William V. Bassett, also an engineer, testified that given a fuller knowledge of the stresses to which the vessel would have been subjected, they would have ordered additional machining to be done on it.

Defendant relied almost exclusively on the testimony of Adolph Schaefer to support its position that thermal stress was the sole cause of the failure. His testimony, however, was undercut by concessions on cross-examination that (1) if he had built the converter, he would have removed the sharp corners and rough machining; and (2) there existed a report on the failure, prepared by defendant's staff, stating that while its cause could not be determined, it was clear that the cracking originated in the vicinity of the sharp corners and rough machining. Moreover, contrary to defendant's assertions, it is indicated in the record that the defendant was aware or, at the least, should have been aware, of the temperature differential that would be present in the vessel when it was placed in operation. Foster Wheeler's May 29, 1962, inquiry, which included specifications for the converter, stated:

> "The vessel shall be designed for at least most severe conditions of pressure and temperature. Besides the internal pressure, the loading shall include all dead and superimposed loads, localized stresses and *stresses through temperature gradients in vessel.*" (Emphasis supplied.)

In addition, in July 1962 a document containing technical data concerning the converter which bore the legend "cold gas inlet" was circulated among members of defendant's engineering staff charged with its design.

■■ Any fair reading of the record in this case leads to the conclusion that the weight of the evidence overwhelmingly supported plaintiff's position. Therefore, despite the court's erroneous rulings prohibiting defendant from qualifying plaintiff's statements concerning the operation of the Chicago Bridge and Iron converter, we do not believe that defendant was so prejudiced that a reversal and remandment for a new trial would be justified.

Due to our disposition of defendant's contentions, we need not reach those points raised by plaintiff in its cross-appeal.

The judgment is affirmed.

Affirmed.

BARRETT and SULLIVAN, JJ., concur.